UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| QVC, Inc.<br><br>    1200 Wilson Drive<br>    West Chester, PA 19380<br><br>        Plaintiff,<br><br>v.<br><br>ANDREI IANCU,<br>    In his official capacity as Director of the<br>    United States Patent and Trademark Office,<br><br>    600 Dulany Street, Madison East<br>    Concourse Level<br>    Alexandria, VA 22314<br><br>        Defendant. | CASE NO. 1:20-cv-319 (AJT/IDD) |

**FIRST AMENDED COMPLAINT**

QVC, Inc. ("Plaintiff" or "QVC"), by counsel, pursuant to F.R.Civ.P. 15(a)(1)(A), as and for its First Amended Complaint against Defendant, Andrei Iancu, in his capacity as the Director of the United States Patent and Trademark Office (the "Director"), alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

1. QVC, Inc. is a Delaware Corporation with its principal headquarters at 1200 Wilson Drive, West Chester, Pennsylvania 19380.

2. Andrei Iancu is the Director of the U.S. Patent and Trademark Office with an

address at 600 Dulany Street, Madison East, Concourse Level, Alexandria, VA 22314.

3. This Court has jurisdiction over the subject matter of this action pursuant to Section 21(b) of the U.S. Trademark Act of 1946 (the "Lanham Act"), as amended, 15 U.S.C. § 1071(b), which provides that a party dissatisfied with a final decision of the Trademark Trial and Appeal Board ("TTAB") may institute a new civil action in a Federal District Court challenging such decision. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(A).

5. This Amended Complaint is timely under F.R.Civ.P. 15(a)(1)(A), as twenty-one days have not elapsed since the Complaint was served on the Defendant.

## FACTUAL BACKGROUND

QVC, Inc.

6. QVC is one of the world's largest multimedia retailers and broadcasters. Headquartered in the United States, QVC offers direct response retail services primarily by means of television, including cable, satellite and over-the-air broadcasts, as well as via the Internet.

7. QVC was founded in 1986 by entrepreneur Joseph Segel, who saw an opportunity for a new kind of retail service built upon technology, yet guided by three customer-focused principles: quality, value and convenience.

8. Within its first year of operations, QVC set a new record for first full-year fiscal sales by a new public company in the U.S., garnering over U.S. $112 million in revenue.

9. The first live QVC broadcast took place in the U.S. on November 24, 1986. Initially, QVC's live broadcast ran for 16 hours per day. Today, QVC's live programs in the

\

U.S. are now broadcast 24 hours per day, 7 days per week, and are live 364 days out of the year.

10. QVC now has three television networks: QVC, QVC2, and QVC3.

11. Since 1996, QVC has also offered its direct response retail services via the Internet. In that year, QVC launched *qvc.com*.

12. QVC's website and mobile apps have been enormously popular. In 2019 alone, there were nearly 840 million digital sessions across QVC's U.S. website, mobile web, and apps.

13. Since 2002, a live stream of the QVC broadcast appears on the U.S. websites.

14. In 2006, QVC expanded its reach on the Worldwide Web by establishing accounts with Facebook and Twitter, two of the world's most popular and trafficked social networking sites, as well as YouTube, the highly trafficked video sharing website. These sites have been enormously popular with consumers worldwide.

15. As of March 20, 2020, QVC has over 2 million Facebook fans.

16. By any measure – program reach, number of customers served, or financial and sales revenue – QVC is among the largest multi-platform, direct response retailers in the world. In 2019, QVC reached 92 million homes in the U.S. and served over 8 million customers. : In fiscal year 2019, of QVC's $10.99 billion in global net revenue, approximately $8.28 billion was generated in the U.S.

17. QVC sells a wide variety of goods, including third-party vendor products. QVC also sells products that are manufactured by third-party manufacturers, but are branded with QVC's trademarks and private labels ("Proprietary Brands").

18. 92% of QVC sales come from repeat customers.

19. Existing QVC customers order 26 items per year.

\

The DENIM & CO. Trademark

20. DENIM & CO. is QVC's most popular and best-selling Proprietary Brand of clothing.

21. Since 1994, QVC has used the mark DENIM & CO. in connection with and on women's apparel.

22. Over the brand's 26-year history, QVC has sold over 125,000,000 units of DENIM & CO.-branded garments in the U.S. These sales translated to over $3.5 billion dollars in revenue.

23. In 2019 alone, QVC shipped 4,412,975 orders for DENIM & CO. apparel items.

24. In 2019, QVC shipped an average of over 12,000 orders for DENIM & CO. apparel items per day.

25. QVC's DENIM & CO. web pages on *qvc.com* received an average of 980,000 unique U.S. visitors per month over the 14-month period from January 2019 through February 2020.

26. Over 5 million QVC customers have signed up to join QVC's email list. Those who have purchased DENIM & CO. products in the past receive emails promoting the DENIM & CO. brand. From time to time, even those who have not previously purchased DENIM & CO. products will also receive emails promoting the DENIM & CO. brand.

27. The DENIM & CO. line of women's apparel covers a wide range of garments, among them, shirts, dresses, skirts, tops, bottoms, sweaters, shorts, pants, jackets, leggings, t-shirts, and swimwear.

28. The unitary DENIM & CO. mark was chosen by QVC not as a narrow reference to the material fabrication of the clothing in this line, but rather to convey to its consumers that

DENIM & CO. clothing is relaxed and comfortable, perfectly in keeping with the casual "denim lifestyle." Accordingly, while some of the garments in the DENIM & CO. line are, in fact, made in whole or significant part of denim, others are not. Indeed, some of the garments – such as sweaters, t-shirts, and swimwear – by their very nature, could not possibly be made of denim.

29. The unitary mark DENIM & CO. was designed to inform consumers that the product line goes well beyond items made from denim. Combining "& Co." with a common noun, such as a fabric type, creates an odd juxtaposition which conveys to consumers that the mark refers to Denim fabrics "and so much more", indicating that other fabrics are also offered in the DENIM & CO. clothing line.

30. The fabric content of DENIM & CO. clothing is clearly communicated to QVC consumers. Both on air and online, during the audio/visual presentations that are part of the purchasing events, QVC identifies the material from which its DENIM & CO. garments are made; thus, there can be no plausible question of deception. These materials include jersey, cotton, gauze, gingham, seersucker, linen, terry, stretch lace, mesh lace, and leather, to name a few.

31. QVC is not alone in using the term "denim" as part of a trademark for both denim and non-denim apparel. For example, Ralph Lauren has a line called "DENIM & SUPPLY," that like QVC's DENIM & CO. line, is intended to be casual and comfortable and, like QVC's line, Ralph Lauren's DENIM & SUPPLY line includes many items that are not denim in fabrication.

32. With millions of consumers purchasing clothing items from QVC's DENIM & CO. line over a 26-year period, it is clear that consumers are purchasing these items due to the high quality of these goods and due to the well-established fame and extensive goodwill

\

associated with the DENIM & CO. mark, and not because of their mistaken notion that QVC's jersey, cotton, gauze, gingham, seersucker, linen, terry, lace, and leather clothing is made of denim.

<u>The Procedural History in the Trademark Trial and Appeal Board</u>

33. On June 22, 2015, QVC filed a use-based federal trademark application for the mark DENIM & CO., Application Serial No. 86/670,074, in Class 25 for various items of women's clothing ("Application").

34. Following a series of Office Actions and Office Action responses, QVC amended the description of goods in the Application to read:

> Women's clothing, namely, shirts, dresses, skirts, tops, bottoms, sweaters, shorts, pants, jackets, leggings, t-shirts made in whole or substantial part of denim; and women's clothing, namely, shirts, dresses, skirts, tops, bottoms, sweaters, shorts, pants, jackets, leggings, t-shirts ***made of materials other than denim all sold through interactive television and interactive online media wherein the clothing products offered for sale are modeled and whereby detailed information regarding such clothing products is provided including information as to the fabrics and materials from which such clothing products are made.***

(emphasis added).

34. On August 13, 2018, the Examining Attorney issued a Final Action in which he accepted the above amendment of goods, approved the Application as to the clothing items made in whole or in part from denim, but rejected the Application as to the following goods:

6

\

>Women's clothing, namely, shirts, dresses, skirts, tops, bottoms, sweaters, shorts, pants, jackets, leggings, t-shirts ***made of materials other than denim all sold through interactive television and interactive online media wherein the clothing products offered for sale are modeled and whereby detailed information regarding such clothing products is provided including information as to the fabrics and materials from which such clothing products are made.***

(emphasis added).

35. The Examining Attorney based this refusal on his opinion that consumers seeing the DENIM & CO. applied to apparel "sold through interactive television and interactive online media wherein the clothing products offered for sale are modeled and whereby detailed information regarding such clothing products is provided including information as to the fabrics and materials from which such clothing products are made" would, nonetheless, be deceived into thinking those clothes are made of denim.

36. This partial refusal rested on the Examining Attorney's determination that DENIM & CO. as applied to "women's clothing, namely, shirts, dresses, skirts, tops, bottoms, sweaters, shorts, pants, jackets, leggings, t-shirts ***made of materials other than denim*** all sold through interactive television and interactive online media wherein the clothing products offered for sale are modeled and whereby detailed information regarding such clothing products is provided including information as to the fabrics and materials from which such clothing products are made" is deceptive under Trademark Act Section 2(a), 15 U.S.C. § 1052(a) and deceptively misdescriptive under Trademark Act Section 2(e)(1), 15 U.S.C. § 1052(e)(1).

37. QVC appealed this refusal to the TTAB on February 11, 2019.

\

38. QVC filed an Appeal Brief on February 14, 2019 and a Reply Brief on April 30, 2019. The Examining Attorney filed an Appeal Brief on behalf of the United States Patent and Trademark Office on April 10, 2019.

39. On September 18, 2019, at QVC's request, the appeal was argued before a three-judge panel of the TTAB.

The Ruling of the Trademark Trial and Appeal Board

40. In a 2-1 Opinion, with a robust dissent, the TTAB majority affirmed the Examining Attorney's refusal to register DENIM & CO. for "women's clothing, namely, shirts, dresses, skirts, tops, bottoms, sweaters, shorts, pants, jackets, leggings, t-shirts made of materials other than denim all sold through interactive television and interactive online media wherein the clothing products offered for sale are modeled and whereby detailed information regarding such clothing products is provided including information as to the fabrics and materials from which such clothing products are made." *In re QVC, Inc.*, 2020 BL 40314 (T.T.A.B. 2020), attached as Exhibit A hereto.

41. The majority was correct when it set forth the test for deceptiveness, stating:

> A proposed mark must be refused as deceptive if: (1) it consists of or comprises a term that misdescribes the character, quality, function, composition, or use of the goods; (2) prospective purchasers are *likely* to believe that the misdescription actually describes the goods; and (3) the misdescription is *likely* to affect the purchasing decision of a significant or substantial portion of relevant consumers. *In re Budge Mfg. Co.*, 857 F.2d 773, 8 USPQ2d 1259, 1260 (Fed. Cir. 1988); *see also In re Tapco Int'l Corp.*, 122 USPQ2d 1369, 1371 (TTAB 2017); *cf. In re Miracle Tuesday, LLC*, 695 F.3d 1339, 104 USPQ2d 1330, 1334 (Fed. Cir. 2012) (the test for materiality incorporates a requirement that a significant portion of the relevant consumers be deceived).

*In re QVC, Inc.,* 2020 BL 40314 at 2 (emphasis added).

\

42. But the majority failed to apply this test and, therefore, its decision was not in accordance with the law.

43. Specifically, in assessing the facts and reaching its legal conclusions, the majority read the word "likely" out of the three-part test.

44. The word "likely" only appears in the majority's decision when setting forth the test for deceptiveness and when quoting or referencing other cases. The majority never used the work "likely" when evaluating the evidence or making factual and legal determinations. Instead, the majority's findings and conclusions with regard to the second and third prongs of the test illustrate that it applied some lower standard.

45. The majority used words and phrases like "believable," "plausible," "does not prevent a consumer from believing," "may," "may not," and "potential deception." None of these are synonyms for "likely" and none convey the impression of being "very probable."[1]

46. The majority also erred by not evaluating the registrability of DENIM & CO. as that mark relates to the goods actually listed in the Application.

47. The majority did acknowledge:

> Registrability of a mark is always considered in conjunction with the identified goods or services, for an applicant cannot obtain rights in a mark in the abstract, only in connection with specified goods or services. *In re ALP of S. Beach Inc.*, 79 USPQ2d 1009, 1019 (TTAB 2006); *see also Roselux Chem. Inc. v. Parson's Ammonia Co., Inc.*, 299 F.2d 855, 132 USPQ 627, 632 (CCPA 1962) (whether a term or mark is merely descriptive must be decided in relation to the goods for which registration is sought and the impact that it is likely to make on the average purchaser of those goods).

*In re QVC, Inc.*, 2020 BL 40314 at 2.

---

[1] MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/likely (last visited Mar. 23, 2020).

\

48. As the TTAB dissent correctly noted, "the majority fail[ed] to give proper weight to the explanatory information in the description of goods." *Id*. at 13.

49. The majority erred by suggesting that the description of goods found in the Application included the term "fabric content." The description of goods found in the Application never refers to "fabric content", such as 85% cotton and 15% spandex.

50. Instead, the Application refers to "fabrics and materials," such as lace, terry, denim, gingham, fleece, poplin, textured knit, waffle, waffle knit, chenille, crepe, corduroy, jersey, gauze, seersucker, linen, leather, and taffeta.

51. The majority erred when it suggested that QVC was seeking to register DENIM & CO. for apparel for which either *advertisements or labels* alone would provide consumers the information regarding the fabric and material from which the apparel was made.

52. The goods for which Applicant seeks registration are "all sold through interactive television and interactive online media wherein the clothing products offered for sale are modeled and whereby detailed information regarding such clothing products is provided including information as to the fabrics and materials from which such clothing products are made."

53. The description of goods in the DENIM & CO. Application makes no mention of advertisements or labels as the vehicles through which the types of fabrics and materials are communicated. Rather, it refers to the information being communicated in the immediate, inseparable context of the purchasing event.

54. To the extent the majority based its decision on advertisements for DENIM & CO. apparel, it committed error. As noted by the dissent,

> advertising is not relevant in the deceptiveness analysis. As noted above,

10

\

>registrability, even in a Section 2(a) refusal that Applicant's mark is deceptive, is determined in connection with the description of goods or services at issue. In this appeal, Applicant's description of goods includes the explanatory statement that the apparel is sold through interactive television and interactive online media where the clothing is modeled and 'detailed information regarding such clothing products is provided including information as to the fabrics and materials from which such clothing products are made.' The explanation of how the goods are sold as part of the description of goods cannot be ignored.

*Id.* at 15.

55. The majority erred when it "assess[ed] whether prospective purchasers consider denim clothing particularly appealing or desirable," *id.* at 9, insofar as it assessed the desirability of denim in relation to "clothing" generally as opposed to the clothing listed in the Application, such as sweaters and t-shirts.

56. The dissent correctly criticized the majority for focusing on clothing items, *per se*, as opposed to the clothing items described in the Application and noted that because the law requires the analysis to be conducted based on the description of goods found in the Application, "[t]he explanation of how the goods are sold as part of the description of goods cannot be ignored." *Id.* at 15.

57. The majority erred in concluding that the "& CO." portion of the unitary mark DENIM & CO. will be perceived as a mere corporate designation as opposed to a clever way of saying "and more" or "and so much more."

58. While "& CO." following a proper noun may be perceived as a corporate designation or as a reference to a group of additional individuals or entities, when "& Co." follows a common noun, such as a fabric type, it creates an odd juxtaposition which conveys to consumers that the mark refers to Denim fabrics "and so much more", indicating that other fabrics are also offered in the DENIM & CO. clothing line.

11

\

59. The majority erred when it held that "in the context of clothing, the mark gives the impression of a business enterprise connected with denim fabric." *Id.* at 5.

60. This holding may have had some merit if the mark were DENIM CO. — without the "&." But the inclusion of the "&" to form DENIM & CO. creates an altogether different impression.

61. As the dissent observed,

> [ . . . ] "company" can mean a group. The mark DENIM & CO. when used in connection with denim clothing and clothing made from other materials engenders the commercial impression of denim and other materials in part due to Applicant's long, extensive, and successful use of DENIM & CO. *See Woolrich Woolen Mills*, 13 USPQ2d at 1238 (holding that the significance of WOOLRICH is that of a trademark-indicating applicant because any descriptive or misdescriptive significance has been replaced by trademark significance as a result of applicant's long and extensive use).

*In re QVC, Inc.,* 2020 BL 40314 at 12.

62. The dissent continued its discussion of the "& CO." portion of the mark and in doing so, addressed the majority's errors:

> The majority disagrees with the preceding analysis, arguing that the most common meaning of the word "Company" is a "business enterprise," which makes sense if the mark were DENIM CO. However, the mark is DENIM & CO. used in connection with clothing made from denim and other materials. Thus, the meaning and commercial impression of the mark changes to a meaning and commercial impression that is not deceptive (i.e., denim and other materials).

*Id.*

63. Further addressing the majority's flawed reasoning, the dissent observed "the majority does not explain the basis for holding that 'it is too much of a stretch to expand this definition to mean a group of other non-denim fabrics.' The majority offers only a conclusion." *Id.* at 13.

12

\

64. The majority was correct when it wrote:

> [m]isdescriptiveness of a term may be negated by its meaning in the context of the whole mark inasmuch as the combination is seen together and makes a unitary impression. *Budge*, 8 USPQ2d at 1261 (citing *A.F. Gallun & Sons Corp. v. Aristocrat Leather Prods., Inc.,* 135 USPQ 459, 460 (TTAB 1962) (COPY CALF not deceptive of non-leather goods because the mark as a whole indicates the goods "are imitations or copies of wallets and billfolds made of calf skin")); *see also In re Simmons, Inc.,* 192 USPQ 331, 333 (TTAB 1976) (WHITE SABLE for "brushes used for artistic painting" is construed in light of the fact that the "characteristic color of sable fur is black" and thus white sable must come from a fictitious animal that cannot deceptively represent brush hair from a real animal).

*In re QVC, Inc.*, 2020 BL 40314 at 3.

65. The majority erred, however, in concluding that DENIM & CO. is a composite mark, as opposed to a unitary mark.

66. The majority erred when it found that "by entering a disclaimer in part, has implicitly conceded that the mark is not unitary with respect to denim clothing." *Id*.

67. Applicant's disclaimer of "denim" applied only to products made from denim and was not a concession that the mark is not unitary.

68. Moreover, as noted by the dissent:

> Applicant's disclaimer of the term "Denim" is of little import because it applies to the clothing made of denim, not the goods at issue in the appeal. In other words, for purposes of this appeal, Applicant has not disclaimed the exclusive right to use the word "Denim." In addition, consumers are not aware of disclaimers that reside in trademark registrations and they play little, if any, role in determining the meaning or commercial impression of a mark.

*Id*. at 12.

69. In addition to affirming the partial refusal to register the mark as being deceptive, the majority affirmed the partial refusal of the mark as deceptively misdescriptive.

\

70.     As the majority correctly noted, "the test for deceptive misdescriptiveness is identical to the first two prongs of the deceptiveness test."

71.     Because the majority's many errors in assessing deceptiveness apply equally to its assessment of whether DENIM & CO. is deceptively misdescriptive, its affirmance of the Examining Attorney's refusal based on deceptive misdescription was the product of errors in both law and fact.

## FIRST CAUSE OF ACTION

72.     Plaintiff incorporates by reference paragraphs 1 through 71 above as if the same were fully set forth herein.

73.     The unitary trademark DENIM & CO. should be declared neither deceptive nor deceptively misdescriptive in connection with "women's clothing, namely, shirts, dresses, skirts, tops, bottoms, sweaters, shorts, pants, jackets, leggings, t-shirts made of materials other than denim all sold through interactive television and interactive online media wherein the clothing products offered for sale are modeled and whereby detailed information regarding such clothing products is provided including information as to the fabrics and materials from which such clothing products are made," and the Director should be directed forthwith to pass the mark to publication.

\

## PRAYER OF RELIEF

WHEREFORE, Plaintiff requests this Court enter judgment:

(a) Reversing the decisions of the TTAB, dated January 21, 2020, and directing the Director forthwith to pass the Application to publication for registration on the Principal Register; and

(b) Awarding Plaintiff such other relief as this Court may deem just and proper.

Dated: April 16, 2020

Respectfully submitted,

/s/ David I. Bledsoe
David I. Bledsoe
VSB 29826
600 Cameron Street
Suite 203
Alexandria VA 22314
Telephone: (703) 340-1628
Fax: (703) 340-1642
Email: bledsoelaw@earthlink.net

Counsel for Plaintiff QVC, Inc.

\